THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* FRANK GIORDANO and Another, Defendants.

County Court, Bronx County, June 25, 1932.

*Charles B. McLaughlin, District Attorney,* and *Sol Boneparth, Assistant District Attorney,* for the plaintiff.

*Max Shientag,* for the defendants.

BARRETT, J. The defendants, Frank Giordano and Dominick Odierno, were indicted by the grand jury of Bronx county on the

5th day of October, 1931, charged with the crime of murder in the first degree, in that they, while acting in concert with each other, killed Joseph Mullens in the county of the Bronx on the 2d day of October, 1931. They were both convicted of murder in the first degree on the 30th day of November, 1931. From the judgment on such conviction an appeal was taken to the Court of Appeals, and on the 26th day of April, 1932, the judgment was unanimously affirmed (259 N. Y. 545). The defendants now ask for a new trial upon the ground of newly-discovered evidence, pursuant to section 465, subdivision 7, of the Code of Criminal Procedure.

The power of the court to grant such motion in a proper case is limited by the provisions of the Code of Criminal Procedure, section 465, which in so far as they apply here are as follows: " The court in which a trial has been had upon an issue of fact has power to grant a new trial, when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application, in the following cases: Where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence." (See, also, Code Crim. Proc. § 463.) The rule thus laid down has been further particularized as follows: " Newly discovered evidence, in order to be sufficient, must fulfill all the following requirements: 1. It must be such as will probably change the result, if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence." (*People* v. *Priori*, 164 N. Y. 459, 472).

As to the defendant Dominick Odierno, the motion for a new trial is based upon his own affidavit, wherein he states that on the 2d day of October, 1931, at the time of the commission of the crime for which he has been convicted, he was in an apartment at Fifty-sixth street and First avenue with Vincent Coll (since deceased), Pasquale Del Greco, also known as Patty Dugan (since deceased), Bob Smith (whereabouts unknown), Chick Gussow (whereabouts unknown), Louis Bigano (now confined in the New York County Penitentiary), and several others whose last names are unknown; that he heard Louis Bifano tell Vincent Coll that he shot " Joe; " that Vincent Coll told him that Chick Gussow and Louis Bifano killed Joseph Mullens. In other words, he now offers

an alibi. He did not take the stand, nor did he call any witnesses to testify as to his whereabouts on October 2, 1931.

As to the defendant Frank Giordano, the motion for a new trial is based upon the affidavits of himself, his sweetheart, Betty White, a friend, Michael Del Grasso, Lucy Brown, Mary Reynolds and Maurice Newmark. The last three mentioned are employees at the Ledonia Hotel. They state that on the day and at the time in question this defendant, Frank Giordano, was in his room at the Ledonia Hotel. He also offers an alibi. The defendant Frank Giordano did not take the stand, nor were any of the affiants herein mentioned called to testify in his behalf, although all were available during the trial. Michael Del Grasso was present during the trial and Betty White was detained in the Bronx county jail as a material witness. It was conceded on the argument of this motion that the alibis now offered by the defendants Frank Giordano and Dominick Odierno do not, strictly speaking, come within the provisions of section 465 of the Code of Criminal Procedure. That is self-evident.

An alibi can never be the basis for a new trial on the ground that it is newly-discovered evidence. Michael Gill identified both of these defendants as the perpetrators of the crime at the trial. In an affidavit dated June 17, 1932, he reaffirms his identification of these two defendants, and further swears that he has seen Louis Bifano and states positively that he is not one of the men engaged in the commission of this crime; that he never saw Philip (Chick) Gussow, whose picture was shown to him; that on Friday afternoon, October 2, 1931, the day of the killing of Joseph Mullens, he went to the photograph gallery at police headquarters and there and then picked out the pictures of the defendants Frank Giordano and Dominick Odierno. Donald Carey, a police detective, states in his affidavit on this motion that he accompanied Michael Gill to police headquarters on October 2, 1931, and there saw Gill pick out from the police files the picture of Giordano as the driver of the car and the picture of Odierno as the man who held the gun. On the trial it developed that the witness Gill made a statement to Assistant District Attorney Breslin on October 2, 1931, at about eight forty-five P. M., as to what he saw and heard that afternoon, to wit, October 2, 1931, about two-thirty P. M. This statement was demanded by the trial counsel for the two defendants, which demand was refused by the district attorney. The court thereupon ruled that the statement was confidential and that the defendants were not entitled to inspect and examine its contents. The statement was later marked for identification by order of the court. The refusal of the court to permit the counsel for the two defendants

the use of the statement above referred to was sustained on appeal. From the statement it appears that Gill on the afternoon in question went to the photographic gallery of the police department and there picked out photographs of two men whom he said resembled the perpetrators of this crime. (It now appears he picked out the pictures of these two defendants.) It was contended on this motion that the fact that Gill had been to police headquarters on October 2, 1931, and while there picked out two photographs of men whom he said resembled these defendants, was unknown to the defendants at the time of the trial and only became known after the record on appeal had been printed, and, therefore, constitutes newly-discovered evidence within the provisions of section 465 of the Code of Criminal Procedure. By no stretch of the imagination can the fact that Gill had been to police headquarters and there picked out photographs of two men be considered newly-discovered evidence within the provisions of section 465 of the Code of Criminal Procedure. I fail to see the force of this argument. How the fact that the witness Gill picked out the photographs of these two defendants on his visit to police headquarters constitutes newly-discovered evidence helpful to the defendants is beyond my comprehension. The People could not have proved that fact upon the trial. The only way I can conceive it might have developed was upon cross-examination. If it had been thus developed it would have strengthened Gill's identification made in the station house on October fourth and upon the trial. In his affidavit on this motion the defendant Frank Giordano states that when he was in prison about a month the codefendant Dominick Odierno told him that Philip Gussow and Louis Bifano killed Joseph Mullens; that at that time he asked no more questions of Odierno about the case, because he was afraid he would not tell him; that some time after the judgment had been affirmed he then asked Odierno more about the case; that Odierno then told him that Vincent Coll, Philip Gussow, Louis Bifano and he (Dominick Odierno) had taken into custody Bob Smith and his helper, two members of a rival gang, and had forced them to go into an apartment at Fifty-sixth street and First avenue; that after a conversation with Bob Smith and his helper, Vincent Coll told Philip Gussow and Louis Bifano to go to the garage at One Hundred and Fifty-first and One Hundred and Fifty-second streets and get a certain party; that Philip Gussow and Louis Bifano then left the apartment and when they returned about an hour later Bifano told Coll that he had shot the man twice. It is contended on this motion that the defendant Frank Giordano did not know until after the judgment had been affirmed

about the matters set forth in his affidavit; that he did not know them at the time of the trial and had no way of ascertaining them because Odierno had kept his mouth shut and had not told him. It is contended that in so far as Giordano is concerned this constitutes newly-discovered evidence within the provision of section 465 of the Code of Criminal Procedure. This is not newly-discovered evidence. Neither Giordano nor Odierno could testify as to what somebody else told them about the killing of Joseph Mullens. Newly-discovered evidence, like all evidence, must be relevant, competent and material. That the moving affidavits must present evidence which will be competent and admissible upon a new trial, if granted, is a rule so firmly established by authority as to preclude discussion. In addition to this, however, Odierno, in a statement which is not disputed, made to Assistant District Attorney Ryan on June 2, 1932, stated that Giordano knew about the killing of " Joe " at One Hundred and Fifty-second street on October 2, 1931, and that they were both told at the same time by Vincent Coll in Giordano's room at the Ledonia Hotel. He also stated that he told his trial attorneys all about Gussow and Bifano. The same attorneys represented both defendants on the trial. The facts now set forth in the affidavits of the defendants Frank Giordano and Dominick Odierno, being within the knowledge of the attorneys who represented them on the trial, is not newly-discovered evidence.

I am convinced that the affidavits submitted on this motion do not bring the case within the provisions of section 465, subdivision 7, of the Code of Criminal Procedure. In view of the importance of my determination to these defendants, to the community at large, as well as my own conscience, I have again read the record on appeal, although I presided at the trial, as well as all papers submitted on this motion. I have addressed myself to a determination as to whether or not the evidence now submitted on this motion, although not, strictly speaking, within section 465 of the Code of Criminal Procedure, would probably have changed the verdict in this case, if received before, or whether it would probably change the verdict on a new trial. With this in mind, I shall briefly refer to the record on appeal and some of the statements now made by the defendants on this motion. At the time of his arrest on October 4, 1931, the defendant Dominick Odierno gave a statement to Mr. Breslin, an assistant district attorney of Bronx county, wherein he stated that on Friday, October 2, 1931, he was in Albany with Vincent Coll and his wife, Lottie Coll, also known as Lottie Moran, and that he came to New York with them on Saturday, October 3, 1931. In other words, at the time of his arrest, he gave an alibi

for himself. Upon the trial the People established through the train crew that Odierno, Coll and the woman referred to as Lottie came to New York on Thursday, October 1, 1931. This point was vigorously contested upon the trial. Every effort was attempted to establish that the train crew was, to put it mildly, mistaken. In his affidavit upon this motion Odierno admits that he lied to Mr. Breslin and that he did, in fact, come to New York on Thursday, October 1, 1931, with Vincent Coll and Lottie Coll. On the trial Vincent DeLucia, a witness for the People, testified that he received a garage ticket for an automobile stored at the Penn Post Garage from Giordano and Odierno. Every effort was made by the defendants to show that this testimony was the result · of a police frameup and that he was beaten by the police and gave the first names that came into his head. Odierno now says that DeLucia spoke the truth; that he did, in fact, give him the garage ticket on Saturday, October 3, 1931, at which time Giordano was present. At the trial the People called three ballistic experts, who testified that the bullets found in the body of the deceased came from a gun found in the possession of Giordano at the time of his arrest. These men were subjected to a vigorous cross-examination as to the truthfulness of their testimony. The defense called two experts, who not only contradicted the People's experts, but went a step further and said, in effect, that there were three bullets found in the body of the deceased. Odierno now says that he heard Bifano say that he shot Joe Mullens twice, once in the head and once in the back. It is now conceded that Mullens was shot only twice. As to the defendant Odierno he now admits everything that was proved against him at the trial was true, except the fact that he was at the scene of the murder, and as to that he now says that he was with Coll and Dugan, who had taken into custody two men who were working for a rival gang. He is the only witness available to testify to this alibi. At the trial evidence was produced tending to show that Giordano purchased an Essex car, plates for which were subsequently found on the murder car. This testimony was attacked upon the trial with the utmost vigor. The defendants endeavored to impeach the credibility of the People's witnesses who testified to these facts. Giordano now admits that he purchased that Essex car at the request of Del Grecco. In his statement to Mr. Breslin he said he purchased it for a man named Bruno, whom he now says is Del Grecco. At the trial evidence was produced tending to show that the defendant Giordano, also known as Frankie Jordan, had in his possession at the time of his arrest a bag containing five guns and a can of ether.

This bag was introduced in evidence, along with some personal effects, among which was a handkerchief bearing the initial " J." This testimony was also vigorously attacked upon the trial. Giordano now says that the bag belonged to Del Grecco and that he did not know its contents. I have referred to this testimony for a single purpose and that is to show that while the trial was in progress many facts now conceded by the defendants were bitterly and vigorously attacked. If what the defendants now say is true, no attempt was made by them to establish it. Upon an examination of all papers submitted on this motion I find a number of discrepancies and contradictions, some of which I shall now refer to. At the time of his arrest the defendant Frank Giordano made a statement to Mr. Breslin in which he said that he engaged rooms at various hotels at the suggestion of a man named Bruno. He now says that wherever he mentioned the name Bruno in that statement he was referring to Pasquale Del Grecco. He also says, at this time, that he engaged rooms at the Cornish Arms Hotel at the request of Vincent Coll. A reading of the statement given to Mr. Breslin and a reading of the affidavit submitted on this motion makes it apparent that not only was he untruthful in his statement to Mr. Breslin, but that his present affidavit does not speak the truth. Giordano now says that Odierno told him that Coll, Odierno, Gussow and Bifano took Bob Smith and his helper into custody on October 2, 1931, whereas Odierno states that Coll and Dugan, not he, took them into custody; that Bifano was in the room when they arrived and that Gussow came in some time later. A reading of all papers submitted indicates that Giordano was in possession of more details as to what occurred on October 2, 1931, than Odierno from whom, it is claimed, he received his information. The defendants, in their affidavits, and in their statements to Mr. Ryan, state that this crime was committed by Louis Bifano and Phillip (Chick) Gussow; that the former did the actual killing, and the latter drove the car. The man referred to as Phillip Gussow is not available. His whereabouts is unknown to the defendants and the court. The man referred to as Louis Bifano was produced in court. He was placed upon the stand and denied that he killed Joseph Mullens. He was exhibited to Michael Gill, who identified Frank Giordano and Dominick Odierno at the trial, and he now states that he is positive that Louis Bifano was not one of the men engaged in the murder of Joseph Mullens. Gill also states that he has seen a picture of Phillip Gussow and that he never saw that man in his life. Anthony Sardo, a witness for the defendants at the trial, was also present in court and stated to the attorney for the defendants that he is unable to identify

any one in particular as the one who fired the shots into the body of Mullens, although at the trial he, in effect, said it was not Odierno. When the defendant Dominick Odierno was questioned by Mr. Ryan on June 2, 1932, at the State prison, he made the following answers to certain questions that were asked of him: " By Mr. Ryan: Q. Are you Dominick Odierno? A. Yes. Q. I understand that you have a statement that you desire to make, have you? A. Was Frank up here yet? Q. Frank who? A. Giordano. Q. He was here. A. What did he say about it? I would like to know what he said about it. Q. I took a statement from him. I want to know whether you have any statement you desire to make? A. I am innocent of this crime. Q. Anything else you want to tell me? A. I haven't made up my mind yet. I figured you would come up about Saturday. * * * " When questioned about the two men whom he said were taken into custody by Coll and Dugan, the following answers were made: " By Mr. Ryan: Q. Did you recognize these fellows? A. Yes. I know one of them. Q. What one do you know? A. They called him Bob. Q. Bob who? A. I don't know his second name. Q. How long do you know him? A. I worked with the fellow. Q. Where did you work with him? A. I was working on the beer. Q. Where? A. I worked for Orso. Q. Doing what? A. I was driving a beer truck. Q. How long did you work with this fellow Bob? A. He worked for Dutch and I worked for Orso and I used to see him every morning. Q. How long did you know him prior to this time in October? A. About six or seven months. Q. And you don't know his last name? A. No sir. Q. All you called him by was the name of Bob? A. Bob. Q. Is that his right name? A. That is his right name. Q. Is he Italian? A. Italian. Q. Isn't that a strange name for an Italian fellow? A. That is how I knew him by, Bob. Q. You knew no other name? You don't know his real family name? A. No. Q. Are you positive of that? A. Positive. * * * " The defendant Giordano in his letter to the Governor, in his statement to Mr. Ryan on June second and in his affidavit on this motion, states it was the defendant Odierno who mentioned the name Bob Smith. Odierno, in his affidavit on this motion, dated June sixth, four days subsequent to his statement to Mr. Ryan, mentioned the name of Bob Smith. In view of the fact that Odierno is claimed to have told Giordano that the name of one of the men who was taken into custody at a time when he was present was Bob Smith, it seems odd to me that when he made a statement to Mr. Ryan on June second he did not know that man's last name. I have given careful and painstaking consideration to the affidavits supporting the alibi now offered by the defend-

ant Giordano. Betty White now states that on Friday, October 2, 1931, she was with Giordano at the Ledonia Hotel between the hours of two and four and four-thirty P. M.; that she arrived at two and met a man known as Michael Del Grasso, who left the room at about three P. M.; that she and Giordano left the hotel about four or four-thirty and went to get something to eat; that when they returned they met Odierno and Coll; that she also saw Gussow and Del Grecco in the rooms; that at Coll's request she and Giordano engaged rooms at the Cornish Arms under the name of Mr. and Mrs. Stern; that on October fifth she told Detective Caso she was with Giordano on October second. On this motion the People, in their answering affidavits, filed with the court Betty White's testimony before the grand jury of Bronx county on October 5, 1931. In a supplemental affidavit made by her on June 15, 1932, she admits that she lied when taken before the grand jury of Bronx county and also lied in a statement made by her to the district attorney of New York county, wherein she stated that she had not seen Coll or Odierno until October 3, 1931. Detective Caso made an affidavit in this case wherein he stated that Betty White did not tell him that she was with Giordano on October 2, 1931; that the first time she mentioned this to him was on May 29, 1932, at Courtlandt avenue and One Hundred and Fifty-sixth street; that he, on the first occasion available, which was on May 31, 1932, made known this fact to the district attorney of Bronx county. Giordano, in a statement made to Mr. Breslin on October 4, 1932, made the following statement: " Q. Where did you meet Bruno? A. At the Ledonia. Q. After you left Bruno at half past 4 on Friday afternoon, what did you do? A. I just went out for a walk as I had an appointment with a girl and I met this girl. Q. What is her name? A. Mary. Q. Where did you meet her? A. I met her at Twenty-third street and Madison avenue and I stayed in the car and I wanted to go some place with her, some room or something, and she didn't want to go." It is quite apparent from a reading of Betty White's affidavit on this motion and comparing them with her testimony before the grand jury and the statement made by her to the district attorney of New York county that she lied in several other respects. Mary Reynolds states that she went to Giordano's room about three o'clock Friday, October 2, 1931; that at that time there were two or three other men in the room, including Michael Del Grasso. Michael Del Grasso, Betty White and Giordano now state that they were the only ones in that room until they left on that afternoon. I have read the affidavits of Lucy Brown and Maurice Newmark in support of this alibi, and while I find no contradictions on the face of them, yet

in view of the contradictions existing relative to this alibi, I am not impressed by them.

On this motion the following argument was advanced by the attorney for the defendants: " I say this to your Honor. In the ordinary case perhaps these affidavits which I have submitted to you would not come within the strict rule' of law applying to newly-discovered evidence. I appreciate that fully as a lawyer. I am not trying to fool myself or trying to impose anything upon your Honor that I know would be futile. I do not do things that way. But here are two men whose lives are at stake. I have not the slightest doubt in my mind, and I say this advisedly and with all the earnestness at my command, that the two men who committed this crime are not these two defendants and that a certain amount of leeway, a certain amount of resiliency, should be used in applying the strict rule of law to the situation that obtains here." That is the spirit in which I approached the consideration of the case. I have read everything that has been submitted. I have tried to reconcile the numerous contradictions appearing therein in order that I might be guided to do substantial justice in this case.

The question for the court to determine, on a motion of this kind, is what would be the probable effect of the evidence now offered upon a jury if it had heard it at the time of the trial or if a new trial was granted. I can only say that I am led irresistibly to the conclusion that the alibis now offered for these defendants are false; that the affidavits submitted by these defendants are, in the main, false. I feel now, after reviewing the whole case, that if the alibi witnesses were called during the trial the result would have been the same. If this case were to be again submitted to another jury the result would undoubtedly be the same. To grant a new trial in the face of this would be to make a mockery of the administration of justice. So far as it is humanly possible to determine, the defendants have been properly convicted. This conclusion having been arrived at with every desire to accord to these defendants all that they are entitled to, under the law, requires that this motion be denied. This motion is, therefore, denied as to both defendants. Order signed.